Simons, J.
(dissenting). I would affirm.
The health and life insurance benefits at issue here are *151 nonfunded "welfare benefit plans” which are not protected by ERISA’s automatic vesting requirements (see, 29 USC § 1002 [1]; § 1051 [1]). The issue, therefore, is a simple one of contract interpretation. Claimants, 165 former employees claiming entitlement to such benefits, must prove that the employer intended the welfare benefits to vest upon retirement (see, Howe v Varity Corp., 896 F2d 1107, 1109 [8th Cir]; Anderson v Alpha Portland Indus., 836 F2d 1512, 1517 [8th Cir]). To meet this burden, they must produce written evidence of an employer’s intent to be bound (see, Ryan v Chromalloy Am. Corp., 877 F2d 598, 603 [7th Cir]; Musto v American Gen. Corp., 861 F2d 897, 900-901 [6th Cir]; Moore v Metropolitan Life Ins. Co., 856 F2d 488, 492 [2d Cir]; Anderson v Alpha Portland Indus., 836 F2d 1512, 1517 [8th Cir], supra). The language of the contract controls and under familiar contract principles the Court may not go outside the plan or the plan documents unless the language is ambiguous.
The majority, in finding for claimants, concludes that the documents are ambiguous. I disagree with its holding because in interpreting the contract, (1) it has misapplied the law by failing to consider provisions in the summary plan description (SPD) and plan documents which clearly reserve CMIC’s right to terminate the plans at issue; (2) it has resorted to the use of extrinsic evidence when no ambiguity as to the right to terminate exists in those documents; (3) it has shifted the burden of proof and rather than requiring claimants to prove a vested right to these benefits has required the employer to prove nonvesting; and (4) it has refused to credit a reservation of rights clause in the Guidebook, and in doing so has imposed a legal standard on the employer that did not exist at the time the benefit plans were adopted and the Guidebook was printed by CMIC.
I
ERISA requires that every employee benefit plan be established and maintained pursuant to a written instrument and that a SPD of that benefit plan be provided to participants and beneficiaries (29 USC § 1102 [a] [1]; § 1022 [a]). These are the documents which the court considers in determining whether an employer has reserved its right to terminate or amend a welfare benefit plan (see, Ryan v Chromalloy Am. Corp., 877 F2d 598, 603, supra; Musto v American Gen. Corp., 861 F2d 897, 900-904, supra; Moore v Metropolitan Life Ins. Co., 856 F2d 488, 492, supra).
*152 Thus, the starting point for determining the claimants’ rights is the Employee Guidebook, which is the SPD required under ERISA (29 USC § 1022), and other relevant plan documents, i.e., the Group Life Insurance policy, the Certificate of Group Life Insurance, the Blue Cross/Blue Shield policy, and the CMIC Employee Medical Reimbursement Plan. None of these documents contain language indicating that CMIC intended the welfare benefits to vest at retirement. On the contrary, they expressly reserve CMIC’s right to amend or terminate the plans at issue.
The Guidebook contains an explicit reservation of rights clause which states that the plans and benefits are completely voluntary "on the part of the Company” and are subject to "modification or termination” at management discretion.[1] The reservation is confirmed by other provisions in the Guidebook and plan documents. In referring to the medical benefits, for example, the Guidebook states not only the language quoted by the majority, but also that "[t]he Basic Blue Cross — Blue Shield coverage remains the same as when you were actively working,” i.e., CMIC promised to provide its retirees with continued medical benefits to the same extent that those benefits would be available if the retiree was still an active employee. If the benefits were not available to employees, they would not be available to retirees. Similarly, the Employee Medical Reimbursement Plan states that: "The benefits described herein, being completely voluntary on the part of the Company, are subject to modification or termination at the considered discretion of the Board of Directors.”[2] Moreover, the Blue Cross/Blue Shield policy expressly provides for termi *153 nation of the medical benefits contract by CMIC upon 15 days’ notice from the anniversary of the effective date.
The Guidebook and plan documents also contain language relating to the life insurance benefits which indicate CMIC did not intend those benefits to vest. While the majority refers to a statement in the Guidebook that the life insurance is provided " 'during your working years and during retirement’ ” with premiums paid by the company (majority opn, at 148), it fails to recognize reservation of rights language on the same page under the heading of "Conversion Privilege”, which states in part that "[a]s set forth in your insurance certificate you may, upon termination of employment or termination of the Insurance Plan by the Company, convert your insurance under the Plan to an individual policy” (emphasis added). Immediately following this language is another paragraph titled "Master Policy to Govern” which states that the controlling contract is the Group Insurance Plan and not the Employee Guidebook. Significantly, the Group Life Insurance policy and the individual certificates, both available to claimants, expressly provide that CMIC retained the power to terminate the policy for any class of individuals previously covered.
In the face of all these statements, it is difficult to comprehend how the company could more clearly and unambiguously reserve its right to terminate these benefits or how claimants can be said to have satisfied their burden of proving that the company intended the benefits to vest on retirement (see, Howe v Varity Corp., supra; Anderson v Alpha Portland Indus., supra).
Nevertheless, the majority contends that various phrases from the SPD and plan documents support vesting. These phrases (see, majority opn, at 148), when considered in the context, establish that the company intended benefits to continue after retirement, but they do not establish that the company intended them to vest at retirement so that management could not later modify or terminate them if the company’s finances required it. The contention that such phrases establish vesting has been rejected repeatedly by the courts (see, e.g., Howe v Varity Corp., supra, at 1109-1110 [summary plan documents stating that welfare benefits "continue in retirement” and plan documents securing employee’s right to claim benefits to which employee "shall have become entitled” prior to termination of plan did not establish retirement as a *154 vesting point]; Anderson v Alpha Portland Indus., supra, at 1518-1519 [collective bargaining agreement stating that benefits provided "until death of retiree” and SPD stating that "coverage will continue for the remainder of your life” did not constitute vesting]; DeGeare v Alpha Portland Indus., 837 F2d 812, 814, 816-817 [promise that future retirees’ benefits "will continue” not a promise of vesting]; Moore v Metropolitan Life Ins. Co., supra, at 490 [benefits described as being for employees "lifetime” at "no cost” did not equal vesting]).
II
The majority believing that the SPD and the plan documents are ambiguous has improperly resorted to the use of extrinsic evidence, such as informal letters and memos. Ironically, if ambiguity is to be found, it is to be found in this extrinsic evidence. It is not clear, for example, whether statements contained in the extrinsic evidence that benefits were "100% vested” referred to health and welfare benefits or employee pension benefits which did vest at retirement. In any event, the use of such evidence is improper. Extrinsic evidence can be considered only when the ambiguity appears on the face of the instruments (Howe v Varity Corp., 896 F2d 1107, 1110, supra; Ryan v Chromalloy Am. Corp., 877 F2d 598, 602, supra; Anderson v Alpha Portland Indus., 836 F2d 1512, supra).
Aside from general contract concerns prohibiting extrinsic evidence, there is an important policy reason for the court’s reluctance to recognize extrinsic evidence to support a claim of vesting for welfare benefits or to infer vesting. As the court stated in Moore v Metropolitan Life Ins. Co. (856 F2d 488, 492, supra): "Congress intended that plan documents and the SPDs exclusively govern an employer’s obligations under ERISA plans. This intention was based on a sound rationale. Were all communications between an employer and plan beneficiaries to be considered along with the SPDs as establishing the terms of a welfare plan, the plan documents and the SPDs would establish merely a floor for an employer’s future obligations. Predictability as to the extent of future obligations would be lost, and, consequently, substantial disincentives for even offering such plans would be created.” (See also, Anderson v Alpha Portland Indus., 836 F2d 1512, 1517; Nachwalter v Christie, 805 F2d 956, 960 [11th Cir]).
Reliance on extrinsic evidence to hold for claimants not *155 only "fl[ies] in the face of ERISA’s plain language” (856 F2d, at 492), but could, as the Moore court noted, decrease protection for future employees and retirees by eviscerating the predictability of future obligations, thus creating substantial disincentives for even offering the welfare benefits in the first place.
III
It is the claimants who must establish vesting. By rejecting the clear language of the SPD and the plan documents, the majority has not only violated established rules of construction in this important area, but it has improperly shifted the burden of proof to the respondent to rebut the significance of isolated phrases in the Guidebook and plan documents when they manifestly contain statements reserving the company’s rights.
There are sound reasons why the burden must remain on claimants. Congress exempted welfare benefits from the automatic vesting requirements and opted for a more flexible approach "because the cost of such plans are subject to fluctuating and unpredictable variables” (Moore v Metropolitan Life Ins. Co., 856 F2d 488, 492, supra). Thus, committees of both the House and Senate noted, in explaining why welfare benefits were not considered "accrued benefits” under ERISA, that " '[t]o require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of [pension] plans whose primary function is to provide retirement income’ ” (Moore v Metropolitan Life Ins. Co., supra, at 491 [quoting HR Rep No. 93-807, 93d Cong, 2d Sess, reprinted in 1974 US Code Cong & Admin News 4639, 4670, 4726; S Rep No. 93-383, 93d Cong, 2d Sess, reprinted in 1974 US Code Cong & Admin News 4639, 4890, 4935). The rationale is particularly persuasive in this case. The 165 claimants in this case did not contribute funds to purchase the benefits they now seek. They are nonfunded. Thus, any award claimants receive must be paid out of the assets of an insolvent insurance company, assets needed to honor the claims of insureds and injured third parties.
IV
Finally, the majority rely on the fact that the Guidebook does not meet ERISA’s disclosure standards. The benefit plan *156 was adopted by CMIC and the Guidebook printed in 1964, 10 years before ERISA was adopted and 13 years before many of its technical disclosure standards became effective standards. Indeed, most of the claimants retired prior to the effective date of these disclosure provisions and can hardly claim the benefits vested at retirement because of any failure to meet ERISA standards at that time. Thus, the majority’s conclusion that the reservation clause in the Guidebook is not entitled to weight because it does not meet ERISA’s technical disclosure standards, is to impose a legal standard on the employer that did not exist at the time the alleged wrong occurred. But even if defects in the Guidebook are to be considered, the burden rested on claimants to establish " 'significant reliance on, or possible prejudice flowing from the summary’ ” (Anderson v Alpha Portland Indus., 836 F2d 1512, 1520, supra; see generally, Bachelder v Communications Satellite Corp., 837 F2d 519, 523 [1st Cir]). They have failed to do so.
V
In sum, I conclude that claimants have not only failed to carry their burden of proof but that the evidence establishes that the benefits did not vest. Because the majority’s determination relies on evidence which legally should not control under settled principles of law, I dissent.
Accordingly, I would affirm the order of the Appellate Division.
Judges Kaye, Hancock, Jr., and Titone concur with Judge Bellacosa; Judge Simons dissents and votes to affirm in a separate opinion in which Chief Judge Wachtler and Judge Alexander concur.
Order reversed, etc.

. "Many of the plans and benefits described herein, being completely voluntary on the part of the Company, are subject to modification or termination at the considered discretion of the Board of Directors.
"The Company, naturally, hopes and expects to continue these plans and benefits indefinitely. In the event of termination of any of the pension plans, any conversion right or benefit vested in the employees will be, of course, paid to the participants as their interests require, pursuant to the trust agreements” (emphasis added).

. The majority claim that the plan was neither filed with ERISA nor distributed to the retirees. Claimants do not allege the plan was not filed, however, and ERISA does not require that the master plan documents or policies be distributed to employees who have not asked for them (see, e.g., Musto v American Gen. Corp., 861 F2d 897). Additionally, there is evidence in the record that the plan documents were made available to plaintiffs upon their request. The relevant language from these plan documents was provided in the stipulated facts and thus was properly considered by the courts as evidence of CMIC’s nontermination intent.